1
2
3
4                          UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7   WILMER D. ORIGEL,                          Case No. C-05-4633 JCS

8              Plaintiff,

9        v.                                    **ORDER DENYING IN PART AND
                                               GRANTING IN PART DEFENDANT'S
10  THE NORTHWESTERN MUTUAL LIFE               MOTION FOR SUMMARY JUDGMENT
    INSURANCE COMPANY,                         [Docket No. 66]**

11
            Defendant.
12  _____/

13  **I.      INTRODUCTION**

14          Plaintiff William D. Origel ("Plaintiff") brought this suit after Northwestern Mutual Life

15  Insurance Company ("Defendant") denied his claim for disability benefits.   Plaintiff sued on

16  November 10, 2005, alleging breach of contract, breach of the implied duty of good faith and fair

17  dealing (hereafter "bad faith claim"), intentional infliction of emotional distress and fraud.  Plaintiff

18  also seeks an award of punitive damages.  Defendant filed the present motion for Summary

19  Judgment on July 25, 2008.   The hearing on Defendant's motion for summary judgment was held

20  on October 31, 2008.

21          For the reasons stated below, the Defendant's motion on the breach of contract, bad faith,

22  and intentional infliction of emotional distress claims is DENIED, as there are genuine issues of

23  material fact in dispute that should be decided by a jury.  Defendant's motion for summary judgment

24  on the fraud claim and the prayer for punitive damages is GRANTED.

25
26
27
28

**United States District Court**
For the Northern District of California

II.     **BACKGROUND**

    **A.  Procedural History**

      William Origel (hereafter referred to as "Plaintiff") was insured under a disability income insurance policy (the "Policy") issued to him by Defendant Northwestern ("Defendant").  The Policy became effective on June 10, 1993, and  provided disability benefits in the event Plaintiff Origel became partially or totally disabled.  Joint Statement of Undisputed Facts, No. 1.

      On September 6, 2002, Plaintiff submitted a Request for Disability Benefits.  *Id.* No. 10.  He claimed that he was totally disabled from his occupation as a chiropractor and had been since August 1, 2002.  *Id.* No. 11.  Plaintiff reported that he was an owner of Med-1 Medical Center, Inc., and performed chiropractic services for the company.  Undisputed Fact No. 13; Declaration of Sharon Kraft, Exh. 2.  Plaintiff further reported that he treated 80-120 patients per day, mostly by performing spinal manipulations.  Undisputed Fact No. 13; Kraft Decl., Exh. 2.  He asserted that he worked 8-10 hours per day, five days per week.  *Id.*  He denied having any other occupation.  *Id.* No. 14.

      In support of his request, Plaintiff submitted an Attending Physician Statement ("APS") signed by Dr. James E. Lee, M.D., on September 11, 2002.  *Id.* No. 16.  Dr. Lee diagnosed Plaintiff with cervical thoracic sprain versus strain upper extremity radiculitis, repetitive use syndrome, and disc protrusions at C5-6, C6-7.  *Id.* No 17.  Northwestern began its investigation to determine whether plaintiff was eligible for benefits under the Policy.  *Id.* No. 19.  The claim was assigned to Sharon Kraft.  *Id.* No. 20.

      On November 18, 2003, Defendant denied coverage because of its conclusion that it did not have proof of work-related limitations beyond the Policy's 91-day Beginning Period.  *Id.* No. 74, 75.  Plaintiff appealed that decision on March 4, 2004.  *Id.* No. 76.  He also apprised Defendant that he had undergone left elbow surgery on February 3, 2004. *Id.*  No. 77.  Defendant sent new claim forms to Plaintiff.  Kraft Decl., ¶28.  On April 4, 2004, Northwestern denied the appeal.  Undisputed Fact No. 78.

      Plaintiff is currently facing criminal charges in San Joaquin Superior Court, *The People v. Origel*, *et al.*  Undisputed Fact No. 79.  Among the allegations in the indictment is a charge of

**United States District Court**
For the Northern District of California

1    submitting a false disability claim to Northwestern in violation of Penal Code Section 550(B)(1).

2    That case remains pending.  According to Plaintiff, Northwestern has assisted the San Joaquin

3    District Attorney's Office in its investigation of Origel.  Declaration of Daniel Horowitz, ¶¶9, 10,

4    Exh. 5.  Plaintiff has provided documents detailing Defendant's use of an investigator to place him

5    under video surveillance from October 14 through October 23, 2002.  Horowitz Decl., Exh. 2.

6    Plaintiff asserts that Defendant later provided this information to the District Attorney's office in

7    order to assist in the criminal prosecution, including providing information to the insurance industry

8    investigator, William Reynolds, in November 2002.  *See* Horowitz Decl., ¶¶ 9-11, Exhs. 5 & 6.

9         Plaintiff filed the complaint in this Court on November 10, 2005.  Defendant now brings this

10   motion for summary judgment, or in the alternative, for partial summary judgment.  Defendant

11   asserts that it is entitled to summary judgment on the breach of contract claim because Plaintiff is

12   not entitled to disability benefits under the policy.  In support of this argument, Defendant asserts

13   that the nature and extent of Plaintiff's disabling condition was never established during the claim

14   handling process.  Further, Defendant argues that Plaintiff's actual occupational activities within his

15   business were not adequately disclosed.  Defendant argues that it is entitled to summary judgment

16   on the bad faith claim because Plaintiff cannot meet the burden of demonstrating bad faith as a

17   matter of law.  Defendant asserts that it is entitled to summary judgment on the intentional infliction

18   of emotional distress claim because: 1) there is no evidence that Defendant's conduct was extreme

19   or outrageous; and 2) Plaintiff suffered neither severe nor extreme emotional distress.  Defendant

20   also asserts that partial summary judgment is appropriate on the fraud claim due to Plaintiff's failure

21   to prove the requisite elements for that claim.  Finally, Defendant seeks summary judgment on the

22   prayer for punitive damages.

23        Plaintiff opposes Defendant's motion on the ground that there are genuine issues of material

24   fact in dispute regarding whether he was disabled.   He further opposes the motion on the ground

25   that he provided ample proof of his occupational duties and activities within his business.  He argues

26   that Defendant's participation in the criminal prosecution is tantamount to bias, resulting in a claim

27   handling process that was a sham.  He further argues that Defendant's experts ignored the weight of

28   the medical evidence that supported a finding of disability.  Plaintiff argues that the denial of the

**United States District Court**
For the Northern District of California

1    claim was a foregone conclusion, thus entitling him to relief on the breach of contract, bad faith and

2    intentional tort claims.

3          Plaintiff has also filed a request for judicial notice and collateral estoppel arising out of

4    statements and rulings made by the trial court in the pending criminal action.  Plaintiff seeks to

5    establish, through collateral estoppel, that he did not make a false claim to Defendant for medical

6    treatment.  He argues that the superior court judge's comments after expert testimony at the

7    preliminary hearing that Plaintiff has a "medical condition" should be used as evidence and

8    considered by this Court here.  Defendant opposes Plaintiff's request, arguing that it is not a party to

9    the criminal action, nor is it in privity with the district attorney's office; therefore, Plaintiff cannot

10   establish the elements of collateral estoppel.  Defendant also argues that the issue in the present case

11   is not whether plaintiff had an injury, but whether he was *disabled* within the meaning of the policy.

12   Thus, the superior court's comments regarding a "medical condition" are not pertinent to the present

13   motion.

14         **B.  The Disability Income Insurance Policy**

15         The disability policy in this matter was issued to Wilmer Origel on June 10, 1993.  As

16   pertinent here, the Policy defines "Total Disability" as:

17         Until the end of the Initial Period, the insured is totally disabled when he is unable to
           perform the principal duties of his occupation.  After the Initial Period, the Insured is totally
18         disabled when he is unable to perform the principal duties of his occupation and is not
           gainfully employed in any occupation.
19

20   Undisputed Fact No. 2.

21   The policy defines Partial Disability as:

22         The Insured is partially disabled when: a) he is unable: 1) to perform one or more of the
           principal duties of his occupation; 2) to spend as much time at his occupation as he did
23         before the disability started; and 3) he has at least a 20% Loss of Earned Income.

24   *Id.* No. 5.

25         Until the Proportionate Benefit has been payable for six months, the Insured need not have a

26   20% Loss of Earned Income to be partially disabled if:

27         a) he is unable to perform one or more principal duties which accounted for at least 20% of

28   the time he spent at his occupation before the disability started; or

                                                        4

United States District Court

For the Northern District of California

b) he has at least a 20% loss of time spent at his occupation.

*Id.* No. 5.

The Initial Period is defined as 60 months of benefits or June 10, 2025 if less, but not less than 24 months of benefits.  *Id.* No. 3.  The words "his occupation" mean:

> the occupation of the Insured at the time he becomes disabled.  If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time he becomes disabled will be combined together to be "his occupation."

*Id.* No. 4.

The monthly benefit amount in this matter is $17,548.  *Id.* No. 6.  The Policy has a 90 day Beginning Period and the maximum benefit period is to plaintiff's age 65.  Under the terms of the Policy, the Insured is required to provide Northwestern written Proof of Disability, as specified in the policy.  *Id.* No. 9.

**C. Plaintiff's Medical History**

**1. Plaintiff's Cervical Spine Injury**

In early 2001, Plaintiff started experiencing pain and stiffness in his back and neck, "bilateral shoulder, elbow, wrist pain and stiffness."  Kraft Decl., Exh. 2 (NM 0030).  Plaintiff complained of numbness that would wake him at night.  *Id.*  Plaintiff listed February 19, 2001, as the date of "gradual onset" of his injuries and noted that at that time, his symptoms "started getting worse."  *Id.*  On May 31, 2002, Plaintiff underwent a cervical spine x-ray.  Dr. Brian Wistow, M.D., found: "Negative cervical spine."  Undisputed Fact No. 22.  The doctor further opined that "the vertebral bodies maintained their proper heights and alignments, and the intervertebral disc spaces were normal."  *Id.* No. 23.  During this time period, Plaintiff continued to work.  Undisputed Fact No. 25.

On July 18, 2002, plaintiff obtained an MRI with Dr. Clifton Choo, M.D.  *Id.*  No. 24.  Dr. Choo's report contains the following findings regarding the spinal cord injury: 1) Mild bulging of the C4-C5 disk centrally resulting in minimal compression on the adjacent anterior central aspect of the spinal cord at this level; and 2) Focal point protrusion of the C5-C6 and C6-C7 disk centrally resulting in mild compression on the anterior cervical aspect of the spinal cord at these levels."  Kraft Decl., Exh. 4 (Dr. Choo radiological report).

United States District Court
For the Northern District of California

1     On September 11, 2002, Plaintiff submitted an Attending Physician Statement ("APS") to

2   Defendant.  It was signed by Plaintiff's business partner, Dr. James E. Lee, M.D.  Undisputed Fact

3   No. 16.  Dr. Lee diagnosed plaintiff with cervical thoracic sprain versus strain upper extremity

4   radiculitis, bilateral upper extremity repetitive use syndrome, *and disc protrusions at C5-6, C6-7*

5   *causing impingement of the spinal cord*.  *Id.* No. 17 (emphasis supplied).  Plaintiff had been

6   receiving "trigger point" injections from Dr. Lee since February 2001, after which he continued to

7   work. Undisputed Fact No. 18.  Dr. Lee's prognosis was that Plaintiff's injuries "may be

8   permanent." Kraft Decl., Exhibit 2 at NM0026 ("APS").  In the APS, Dr. Lee asserted that Plaintiff

9   should "avoid doing spinal manipulation to prevent further compression on the spinal cord and avoid

10   possible surgical intervention." *Id.*  He recommended that Plaintiff change professions, "like a

11   physician's assistant if he wants to continue seeing patients." *Id.*  He noted that he has restricted

12   Plaintiff from his work doing chiropractic manipulation as of August 1, 2002.  *Id.*

13     In October 2002, Dr. Provenzano reviewed the MRI report prepared by Dr. Choo and

14   concluded that Plaintiff  "actually has enough disk protrusion to press against his spine in the

15   cervical areas." *Id.* Horowitz Decl., Exh. 18, RT3698:14-19.  Dr. Provenzano testified at

16   proceedings in connection with the criminal case, that Plaintiff's medical condition might prevent

17   him from remaining in the practice of  chiropractic medicine, and that he may need to change his

18   profession.  *Id.*  RT 3688:19-21.[1]

19     Defendant obtained a letter dated October 15, 2002, in which Dr. Carl Tlumacki, D.C., of

20   Plaintiff's company, Med-1 medical Center Inc., stating that he had treated Plaintiff from 2000-

21   2002.  He noted that Plaintiff's symptoms "have been progressively getting worse with the high

22   volume of patients he has treated."  Kraft Decl., Exh. 12.  He recommended that Plaintiff

23   "discontinue providing spinal manipulations based on the July 18, 2002 MRI report that found C5-

24   _____

25     [1]Because many of Dr. Provenzano's opinions were offered during testimony at a preliminary
    hearing in the criminal case in 2006, there is no evidence that these opinions were known to Defendant
26   during the relevant time period.  This evidence may, therefore, not be relevant to the claims in this
    matter.  This same problem arises with respect to the testimony of one of Plaintiff's doctors, Robert
27   England.  The Court does not rely on this evidence in denying summary judgment on the claims for
    breach of contract, bad faith and intentional infliction of emotional distress.  Moreover, even if this
28   evidence is admissible, the Court would still conclude that the claims for fraud and punitive damages
    are barred as a matter of law.  Accordingly, the Court need not decide the admissibility of this testimony
    for purposes of deciding Defendant's motion.

United States District Court

For the Northern District of California

1  C6 &C6-C7 disc protrusions resulting in mild compression on the anterior central aspect of the

2  spinal cord." *Id.*

3          As part of its investigation, Defendant sought the opinion of a radiologist, G.F. Carrera,

4  M.D., from The Medical College of Wisconsin, to review the July 18, 2002 MRI.  Undisputed Fact

5  No. 26.  Dr. Carrera prepared a report on December 22, 2002, in which he concluded that the July 18

6  films were of "average diagnostic quality."  *Id.*  No. 27.  He further opined that the alignment of

7  Plaintiff's cervical spine was normal.  *Id.* No. 28.  He asserted that Plaintiff had "very mild

8  degenerative changes at C5-6 and C6-7 with a small ventral ridge which just reaches the spinal cord

9  in the axial plane, but demonstrates no compression and no asymmetric displacements." *Id.*  No. 29.

10  There is no evidence in the record of an independent medical examination of Plaintiff performed by

11  Dr. Carrera.

12          Defendant's consultant Henry Alba, M.D., a board-certified physician in Physical Medicine

13  and Rehabilitation, reviewed Plaintiff's records and concluded that these records did not support

14  "total limitations."  *Id.* No. 29-32.  There is no evidence that Dr. Alba performed an examination of

15  Plaintiff.

16          Plaintiff's consultant, Dr. Robert England reviewed Plaintiff's medical history, including the

17  radiologists' reports and doctors' examinations, and treatment history.[2]  Horowitz Decl., Exh. 16,

18  RT 3600:22-28; 3601:11-14.  He concluded, contrary to the conclusions of Defendant's consultants,

19  that Plaintiff was disabled.  *Id.* RT3608.  Dr. England prepared a report in June 2004, which he

20  addressed to Dr. Provenzano and Dr. Rajagapalan.  *Id.* RT 3601:11-14.  Dr. England found

21  degenerative disease of the cervical spine and headaches, and referred pain from the cervical spine

22  into the scapular area.[3]  Dr. England advised Plaintiff not to return to performing chiropractic

23  adjustments "[b]ecause if you continue to put stress in the shoulders, continue to put stress on the

24

25          [2]As stated above, there is no evidence in the record that Dr. England's opinions as reflected in
26  this testimony were available to Defendant at the time of the coverage decision.  They are accordingly
   not relied upon for purposes of the present motion for summary judgment.

27          [3]Dr. England explained further:  "This is one reason why back pain and disk pain has been so
28  difficult, is because you can't see this, you have to do a special assay to find it.  And if you take x-rays
   or MRI's often these will be negative. And the patient will complain of significant pain. . ." Exh. 16,
   RT3606:10-14.

7

United States District Court
For the Northern District of California

cervical spine, you're going to have further degenerative changes or further problems, increased

pain, and you're going to have continued difficulty and he would be best off changing his job." *Id.*

RT 3610:12-17.

### 2. Plaintiff's Left Shoulder and Right Shoulder/Arm Injuries

On November 9, 2002, Dr. Choo obtained an MRI of plaintiff's left shoulder.  Undisputed

Fact No. 33.  He concluded that there was no definite tear of the left rotator cuff.  *Id.*  No. 34.  Dr.

Choo found abnormalities, however.  He diagnosed problems with Plaintiff's left shoulder:

"Although no definite tear of the left rotator cuff is identified, the fact that fluid is noted

subacrominal/subdeltoid bursa suggests a partial tear of the left rotator cuff which is not visualized

on the current study."  Kraft Decl., Exh. 6.  In October 2002, Plaintiff saw Dr. Provenzano for his

left shoulder pain.  Horowitz Decl., Exh. 18, RT 3687:4.  On October 31, 2002, Dr. Provenzano

diagnosed rotator cuff impingement syndrome of the left shoulder.  *Id.*  RT 3687:26-28.  Plaintiff

continued seeing Dr. Provenzano in 2003 and 2004 for these injuries, as well as for his lower back

pain and leg numbness.  *Id.*  RT 3688:1-2; 3687:5-6.

Dr. Lee provided a follow-up letter to Defendant on November 27, 2002, explaining that

"NCV revealed left radiculopathy and left ulnar entrapment at the elbow" and the July 18 MRI

"revealed left rotator cuff tendinosis [sic] with a partial tear."  Declaration of Daniel Horowitz,

Exhibit 11.  Dr. Lee concluded that:  "The patient has been advised to discontinue performing spinal

manipulations since this will be worsening his condition. . ."  *Id.*

Plaintiff's consultant, Dr. England, reviewed the MRI prepared by Dr. Choo in November

2002 of the left shoulder, and the MRI report of January 2003 of the right shoulder.  He observed

that the reviewing radiologists had reached the same conclusions – evidence of rotator cuff tendinitis

and partial rotator cuff tear.  Horowitz Decl., Exh 17, RT 3626:21-23.  Dr. England reviewed

Plaintiff's medical and treatment history, concluding that among other injuries, Plaintiff had

"epicondylitis at the elbow" and found degenerative changes to the right shoulder that would "cause

mild background pain and become worse with use."  Horowitz Decl., RT 3609:26-28; 3610:1-6.

Defendant obtained a copy of the left shoulder MRI and sent it to its consultant, Dr. Carrera,

for his review.  Undisputed Fact No. 35.  Dr. Carrera found the MRI to be of such a quality that it

United States District Court
For the Northern District of California

rendered "good detailed analysis of this MRI scan problematic." *Id.* No. 36.  He opined that the "rotator cuff looks intact although it must be emphasized that the photographic technique would render subtle changes in the cuff difficult to discern." *Id.* No. 37.  He concluded that he saw "no definite evidence for rotator cuff abnormality or major degenerative disease." *Id.* No. 38.  He did note, however "[a] small amount of abnormal signal in the rotator cuff suggests, but is not a conclusive correlate, of some degree of rotator cuff tendinitis." Kraft Decl., Exh. 7.  On April 1, 2003, Dr. Carrera confirmed his initial findings, stating "other than very questionable mild degenerative change in the head of the humerus, and possible minimal increased signal in the rotator cuff, suggesting a minor degree of tendinitis, the examination on the left is essentially normal." *Id.* No. 40.

On January 25, 2003, Defendant evaluated Plaintiff's assertion of right shoulder problems, which included Plaintiff's MRI scan of the right shoulder on January 25, 2003. *Id.* No. 41.  The radiologist, Paul Stadelman, M.D., found that the MRI suggested either tendinosis or "partial rotator cuff tear."  He found no evidence of a "full thickness rotator cuff tear." *Id.* 42, 43; Kraft Decl., Exh. 9.  Dr. Carrera reviewed the MRI films and concluded that there was no evidence of a right rotator cuff tear, nor were there definite abnormalities of the right shoulder. *Id.* 44-46.

### 4. Plaintiff's Cubital tunnel Syndrome/Radiculopathy

Defendant obtained a copy of a Nerve Conduction Study ("NCS"), Upper Extremity, performed on August 21, 2002, by Richard Newman, M.D.  Undisputed Fact No. 47.  The report is dated October 8, 2002. *Id.* No. 48.  Dr. Newman opined that "the motor nerve conduction velocities of the right and left median and ulnar nerves, as well as their distal motor latencies, are within normal limits." *Id.* No. 49.  He found that "the distal sensory latencies for the ulnar, radial, and median nerves are within normal limits." *Id.* No. 50.  He concluded that "[t]he F-wave responses obtained upon stimulation of the right and left median and ulnar nerves at the level of the forearm and elbow are delayed at left ulnar nerve." Kraft Decl., Exh. 10.  He concluded that the NCS was abnormal. *Id.*  Dr. Newman explained that this finding is consistent with "left C8 radiculopathy." *Id.*  He opined that it may be caused by "a herniated nucleus pulposus and/or trauma to the nerve at this level.  Findings are also consistent with left ulnar entrapment at elbow." *Id.*

1   Defendant obtained plaintiff's medical records from Sierra Hills Surgery medical Center,

2   Inc., Sacramento, CA.  Undisputed Fact No. 53.  The records included an "initial medical

3   evaluation" dated October 2, 2002, by Kenneth Thomas M.D. *Id.*  No. 54.  Dr. Thomas diagnosed

4   radiculopathy and cubital tunnel syndrome.  Kraft Decl., Exh. 11.  Within the Sierra Hills medical

5   file was a letter dated October 15, 2002 from Dr. Tlumacki, D.C. of Plaintiff's company, Med-1

6   Medical Center Inc., stating that Plaintiff has developed cubital tunnel and carpal tunnel symptoms.

7   Kraft Decl., Exh 12.

8    On February 13, 2002, Plaintiff had a medical consultation with Dr. Bal Rajagopalan,  M.D.,

9   at the referral of Dr. Robert Boroff, M.D.  Undisputed. Fact No 57.  Dr. Rajagopalan diagnosed left

10  cubital tunnel syndrome.  Undisputed Fact 57, 58.

11   In February 2003, Plaintiff underwent an EMG/NVS with Dr. Alan Russakov, M.D, at the

12  referral of Dr. Boroff.  Kraft Decl. ¶ 21, Exh. 14.  Dr. Russakov's report indicates "slowing of the

13  left ulnar nerve conduction in across elbow segment" and "moderate left ulnar nerve compromise at

14  elbow." *Id.*  The parties agree that Dr. Russakov is affiliated with plaintiff's business, Med-1

15  Medical Center.  Undisputed Fact 59.

16   Plaintiff's consultant, Dr. England, found C8 radiculopathy with pain, including residual

17  damage to Plaintiff's left elbow region even after the surgery performed by Dr. Smith.  *Id.* Horowitz

18  Decl., Exh. 16, RT 3609:1-9,16-19.  Dr. England was of the opinion that Plaintiff had overuse of the

19  upper extremities caused by "doing manipulations on a sustained and frequent basis.*"  Id.* RT

20  3602:20-25.

21   In February 2003, Dr. Rajagapalan referred Plaintiff to Dr. Todd Smith, a surgeon

22  specializing in cubital and carpal tunnel surgeries.  Horowitz Decl., Exh. 15, RT3584.  Dr. Smith

23  testified at the preliminary hearing in the criminal case that "the diagnoses at that point in time was

24  not really in question.  The main question asked of me was how to treat this." *Id.*   After reviewing

25  the EMG, the x-rays and other information provided by Plaintiff, Dr. Smith "concurred that he did in

26  fact have a cubital tunnel syndrome."  Horowitz Decl., Exh. 15, RT 3585. This diagnosis was later

27  confirmed after Dr. Smith performed surgery on Plaintiff in February of 2004.  *Id.* at RT 3586-3587.

28

**United States District Court**
For the Northern District of California

1    Defendant's consultant, Dr. Alba, reviewed all of Plaintiff's medical information.[4]

2    Undisputed Fact No. 60.  Defendant also sought the opinions of Dr. Jacqueline Wertsch, M.D.,

3    Diplomate, American Board of Electrodiagnostic Medicine to review the electrodiagnostic

4    information.  *Id.* No. 61.  With respect to Dr. Newmans' October 8, 2002 report, Dr. Wertsch found

5    the "Nerve Conduction Study to be inadequate and not diagnostic.  *Id.* No. 63.  With respect to the

6    February 26, 2003 EMG/NCS, Dr. Wertsch concluded that she would not have found a "moderate

7    left ulnar nerve compromise at the elbow" from the limited information given.  *Id*. No. 65.  She

8    further noted that there was only a left ulnar motor study given.  *Id.* No. 66.  She stated that there

9    was a lack of detail, and lack of nerve and sensory studies provided in the EMG/NCS.  *Id.* No. 67.

10   Dr. Wertsch reviewed the findings of Dr. Rajagopalan, and concluded that there was an

11   inconsistency in the report regarding "negative" and "positive" Tinel's.  *Id.* No. 69.  Dr. Wertsch

12   concluded that there was "no clear, thorough, internally consistent data base to support any specific

13   diagnosis." *Id.* No. 70.  She also concluded that Plaintiff's ability to obtain relief with elbow flexion

14   does not support a left cubital tunnel diagnosis.  Kraft Decl., Exh. 15.

15       In October 2003, Dr. Alba provided his final medical review.  Undisputed Fact No. 72.  He

16   opined that there was no "clear cut" period of impairment.  Kraft Decl., ¶ 25.

17                          **D.  Plaintiff's Occupational Responsibilities**

18       In February 2003, Defendant decided to conduct a financial audit of Plaintiff's business in

19   order collect more information about Plaintiff's occupational duties and responsibilities *prior to the*

20   *onset of his disabilities*.  Kraft Decl., ¶ 23.   Defendant hired Peters & Associates, certified public

21   accountants, to conduct the audit.  Kraft Decl., ¶ 23-24.  The audit was permitted under Section 4.8

22   of the Policy.  Kraft Decl., Exh. 16.

23

_____

24       [4]It does not appear that Dr. Alba reviewed any information prepared by Dr. Todd Smith as part

25   of the initial recommendation to Defendant to deny the claim.  The claim was denied in November 2003,
     prior to the date of Plaintiff's surgery in February of 2004.  After Plaintiff appealed the denial of the

26   claim, Dr. Alba reviewed a report prepared by Dr. Todd Smith.  Kraft Decl.,¶ 28.  At that point, Dr.
     Alba agreed that plaintiff would have a six week period of total impairment, followed by six weeks of

27   partial impairment.  *Id.* Sharon Kraft declares that she then mailed new claim forms to Plaintiff
     regarding disability resulting from the February 2004 surgery (which of Plaintiff contends was just a
     continuation of the same disability, and not a "new" disability at all).  Defendant alleges that Plaintiff

28   never submitted the claim form.  The appeal was subsequently denied on April 1, 2004.  Undisputed
     Fact No. 78.

**United States District Court**
For the Northern District of California

1    The auditors reviewed patient files for the week of October 1, 2001. *Id.* at Exh. 17, NM519.

2    The auditors obtained detail of procedures performed by Plaintiff from January 2001 through July

3    2002, by month. *Id.* The first report prepared by the firm in June 2003 notes that "the detail agrees

4    with the summary information previously provided to your office." *Id.*

5    The auditors returned to Plaintiff's office and requested two months of records in order to

6    substantiate plaintiff's claim of having performed 80-120 chiropractic adjustments on patients per

7    day. Kraft Decl., Exh.18. They concluded that the majority of fee slips it had received were from

8    chiropractors other than Dr. Origel. *Id.* Exh. 18, NM552. The report notes that "Dr. Origel still

9    asserts that he performed the manipulations. He also indicated that even though other chiropractors

10   signed the fee slips that he still could have done the manipulation." *Id.*

11   Peters & Associates prepared two reports regarding its audit, the first of which is dated June

12   6, and the second dated August 20, 2003. Undisputed Fact 72; Kraft Decl., Exhs. 17 and 18.

13   According to the Defendant, the majority of information requested was not produced by Plaintiff.

14   As examples, Defendant cites appointment calendars, auto logs, mileage reimbursement requests and

15   maintenance records for June-August 2001 and June-August 2002, cell phone records, patient charts

16   and W-3 transmittals and 1099's for the pertinent years for Med-1 and Unique Healthcare

17   Management. *Id.* at NM554. Based upon the reports, Defendant concluded that it did not have

18   sufficient proof of work-related limitations beyond the Policy's 91-day Beginning Period.

19   Undisputed Fact 75. Defendant therefore claims that it was precluded from ascertaining the nature

20   and extent of plaintiff's activities at Med-1 and Unique Healthcare Management, including any

21   limitations and restrictions plaintiff had as they relate to his occupation. Plaintiff asserts that he

22   provided Defendant with significant information regarding his business, duties and responsibilities.

23   For example, he provided his personal and business tax returns for the years 2001 and 2002 as

24   requested by Defendant. Horowitz Decl., ¶13, Exhs. 8-10.

25   **III.    ANALYSIS**

26   **A.    Summary Judgment Standard**

27   Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be

28   rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

**United States District Court**
For the Northern District of California

1   together with affidavits, if any, show that there are no genuine issues as to any material fact and that

2   the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine"

3   issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for

4   the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

5           In order to prevail, a party moving for summary judgment must show the absence of a

6   genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or

7   to a defense on which the nonmoving party will bear the burden of persuasion at trial. *Celotex Corp.*

8   *v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210

9   F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party

10  opposing summary judgment to "designate specific facts showing there is a genuine issue for trial."

11  *Celotex*, 477 U.S. at 323.  To establish a "genuine" issue of fact when opposing summary judgment,

12  a plaintiff must "produce at least some significant probative evidence tending to support" the

13  allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

14  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

15  from the facts are jury functions, not those of a judge.... The evidence of the nonmovant is to be

16  believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

17          **B.      Legal Standard**

18          Because this Court's jurisdiction is based on diversity, California substantive law applies.

19  *Heighly v. J.C.Penney Life Insurance Co.*, 257 F.Supp.2d 1241, 1251 (C.D. Cal. 2003).

20          **C.      Request for Collateral Estoppel and Judicial Notice**

21          Plaintiff has filed a "Request for Collateral Estoppel and Judicial Notice" seeking to establish

22  the following facts: (1) Dr. Origel has a medical condition as presented to Northwestern Mutual; and

23  (2) Dr. Origel did not make a false claim to Northwestern Mutual for medical treatment.  *See*

24  Plaintiff's Request at 2.  In order for collateral estoppel to apply, there are five threshold

25  requirements: 1) the issue to be precluded must be identical to that decided in the prior proceeding;

26  2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily

27  decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party

28  against whom preclusion is sought must be in privity with the party to the former proceeding.

1    *People v. Sims,* 32 Cal.3d 468, 484 (1982).  In order to prevail on a theory of collateral estoppel,

2    among other requirements, Plaintiff must show that Northwestern and the San Joaquin County

3    District Attorney's Office are in "privity."  Plaintiff concedes in his request that this is "a close

4    case."  Plaintiff's Request at 3.  Plaintiff cites  *People v. Garcia,* 39 Cal.4th 1070, 1077 (2006),

5    *citing People v. Sims,* 32 Cal.3d 468, 484 (1982).  There the court found the district attorney's office

6    and the county –  both of whom were governmental agencies acting to "vindicate the rights of the

7    same governmental entity" – to be in privity.  *Id.*  Plaintiff cites no authority for the proposition that

8    an insurance company should be held to the outcome or factual findings in a criminal case.  Nor are

9    there sufficient facts in the record before the Court to conclude that the relationship between the

10   Defendant and the District Attorney's Office was "sufficiently close" so as to justify application of

11   the doctrine here.

12        The issues decided in the criminal case are not necessarily the same as those before this

13   Court.  Here, the question of whether Plaintiff was "disabled" as defined in the policy and whether

14   benefits were properly denied cannot be decided by a finding that Plaintiff has a "medical

15   condition."  Plaintiff's request is DENIED.

16        **D.  Breach of Contract Claim**

17        In order to prevail on its motion for summary judgment, Defendant must show that there is

18   no genuine issue of material fact and that Plaintiff was not disabled during the relevant time period.

19   Defendant argues that Dr. Carrera, Dr. Wertsch and Dr. Alba were well-qualified medical

20   consultants who reviewed Plaintiff's medical records and appropriately concluded that Plaintiff did

21   not possess a medical condition that restricted or limited him from performing his duties as

22   chiropractor or his duties as an owner of Med-1 and Unique Healthcare.  Def's Reply at 2-3.

23   Defendant further argues that it was prevented from ascertaining the nature and extent of plaintiff's

24   job duties and responsibilities.  Defendant therefore argues that it is entitled to summary judgment

25   on the breach of contract claim.

26         In opposition to Defendant's motion, Plaintiff cites evidence in the form of several doctor's

27   opinions and reports that: 1) During the relevant time period, Wilmer Origel had at least four

28   separate injuries involving his spine, neck, both shoulders, and both elbows, which rendered him

1   disabled since August 1, 2002; 2) his injuries rendered him unable to perform spinal manipulations;

2   and 3) he worked as a chiropractor and treated 80-120 patients per day, 8-10 hours per day, five days

3   per week during the relevant time period.   Plaintiff further argues that he provided ample proof of

4   his occupational responsibilities and duties, sufficient for Defendant to determine his "occupation"

5   and entitlement to benefits under the policy.

6           First, a reasonable jury could conclude that Defendant had sufficient proof of Plaintiff's

7   duties and responsibilities.  With respect to the audit, based upon a review of the documents, it

8   appears that while Plaintiff did not comply with every one of the auditor's requests, he did provide

9   significant information about his duties and responsibilities.  Indeed, the auditors' report suggests

10  that the detail of procedures during the relevant time period was consistent with the earlier

11  submissions to the insurance company.  Kraft Decl., Exhs. 17, 18.  While there is certainly some

12  discrepancy with respect to the number of manipulations Plaintiff performed per day (his claim of

13  performing 80-120 manipulations per day in an 8-10 hour work day is potentially subject to

14  challenge), a jury could believe this assertion.  While fee slips for patients treated by Plaintiff

15  contain signatures of other chiropractors,  "[a]ccording to Dr. Origel and his staff (including Mr.

16  Milliger), even though some of the fee slips are signed by other chiropractors, he still performed all

17  of the manipulations."  Kraft Decl., Exh. 18.  Defendant cites no case authority for the proposition

18  that failure to comply with every demand of an insurance company's auditing firm results in the

19  proper denial of benefits.

20          There was also sufficient evidence presented for a jury to conclude that Plaintiff was

21  disabled within the meaning of the policy.  Plaintiff produced evidence, which, if believed, proves

22  that he was disabled.  He has submitted reports from at least six doctors, Dr. Lee, Dr. Thomas, Dr.

23  Tlumacki, Dr. Smith, Dr. Provenzano, and Dr. Choo, all of whom evaluated Plaintiff or performed

24  diagnostic procedures on him.  These medical opinions and reports were provided to Defendant, and

25  constitute evidence of Plaintiff's disability during the relevant time period.  Defendant's motion for

26  partial summary judgment on the breach of contract claim is DENIED.

27

28

**United States District Court**
For the Northern District of California

1

### E.     Bad Faith Claim

2      Under California law, in order to prevail on a claim for breach of the implied covenant of

3   good faith and fair dealing, Plaintiff must establish that the Defendant's denial of the claim was

4   unreasonable or without proper cause. *Love v. Fire Ins. Exch.*, 221 Cal. App.3d 1136, 1151 (1990).

5   If there was a "genuine dispute" as to the insurer's liability, a court can conclude as a matter of law

6   that the insurance company's denial of the claim was not unreasonable. *Opsal v. United Services*

7   *Auto. Assn.,* 2 Cal. App. 4th 1197, 1205-1206 (1991);   *see also Lunsford v. American Guarantee &*

8   *Liability Ins. Co.,* 18 F.3d 653, 656 (9th Cir. 1994) (citations omitted).  The "genuine dispute"

9   doctrine may be applied in cases where the insurer denies a claim based upon the opinions of

10  experts.  *Fraley v. Allstate Ins. Co.,* 81 Cal.App.4th 1282, 1291 (2000).  More recently, the

11  California Supreme Court has approved the "genuine dispute" doctrine as articulated in *Fraley.*

12  *Wilson v. 21st Century Ins. Co.,* 42 Cal.4th 713, 723-24 (2007).

13      In *Guebara v. Allstate Ins. Co.,* 237 F.3d 987 (9th Cir. 2001), the Ninth Circuit reviewed the

14  state of California law on this issue and concluded that the "genuine dispute" doctrine should be

15  applied on a case-by-case basis:

16          In some cases, the application of the rule to purely factual disputes will be inappropriate.  In
            others, investigations by a defendant's independent experts will permit the invocation of the
17          doctrine and summary judgment for the defendant on a bad faith claim.

18  *Guebara*, 237 F.3d at 994.  The court declined to adopt a bright-line rule limiting the doctrine to

19  insurance disputes involving purely legal or contractual disputes.  *Id.*   Although it is clear that the

20  "genuine dispute" doctrine may be applied to factual disputes such as the one in the present case, it

21  is noteworthy that the majority of cases in California that have found "a genuine dispute over an

22  insurer's coverage liability have involved legal rather than factual disputes[.]" *Chateau Chamberay*

23  *Homeowners Ass'n. v. Associated International Ins. Co.*, 90 Cal.App.4th 335, 348 (2001).

24      In a recent decision of this Court, Judge Alsup reviewed California case law, citing

25  circumstances in which a bad faith claim should proceed to a jury:

26           (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings;
            (2) the insurer's employee's lied during the depositions or to the insured; (3) the insurer
27          dishonestly selected its experts; (4) *the insurer's experts were unreasonable*; and (5) the
            insurer failed to conduct a thorough investigation.

28

United States District Court
For the Northern District of California

1  *Anderson v. USAA Cas. Ins. Co.,* 2008 WL 619004, at *8 (N.D. Cal.  March 4, 2008) (emphasis

2  supplied), *citing Chateau Chamberay*, 90 Cal.App.4th at 348-49.  Judge Alsup observed that there

3  must be "factually supported suggestions of bias in the record."  *Id.*

4       Defendant argues that Plaintiff's claim for bad faith fails as a matter of law because there

5  was a genuine dispute regarding Plaintiff's eligibility for benefits under the policy based on the

6  evidence of "conflicting medical opinions."  *Id.*  Defendant points to the medical opinions of Dr.

7  Carrera, Dr. Alba and Dr. Wertsch as support for the argument that there were legitimate conflicting

8  medical opinions in this case.[5]

9       Plaintiff opposes Defendant's motion, arguing that Defendant essentially classified

10  Plaintiff's claim as a fraud from the outset, and reviewed it with the intent of denying it.  Plaintiff's

11  Opp. at 21.  Plaintiff points to the insurance company's cooperation in the criminal prosecution of

12  Plaintiff, including the hiring of private investigators to follow and videotape Plaintiff's actions.

13  Plaintiff also argues that Defendant's experts ignored the weight of the medical evidence that

14  supported a finding of disability.

15       There is evidence in this case that could support an inference, albeit a weak one, of bad faith

16  in this case.[6]  Defendant argues that the presence of experts means that this Court *must* decide the

17  case as a matter of law.  *Guebara, supra,* however, is clear that there is no "bright-line rule" with

18  respect to the application of the "genuine dispute" doctrine.  Defendant cannot merely rely upon the

19  existence of experts in the case to prevent bad faith liability:  "[A]n expert's testimony will not

20

21

22 _____

23       [5]Plaintiff has filed an evidentiary objection to the introduction of Dr. Wertsch and Dr. Alba's reports as evidence under Federal Rule of Evidence 803(8).  Plaintiff argues that the introduction of this evidence is improper as the public record hearsay exception does not apply to medical reports prepared

24  in anticipation of litigation.  This objection is overruled. These reports are relevant to the issue of whether Defendant acted in bad faith, or had a reasonable basis for its position.  On this issue, the

25  reports are not hearsay.

26       [6]The Court is not persuaded by Plaintiff's argument that Defendant's cooperation with the criminal prosecution against him is evidence of bias.  First, there is no evidence of when the cooperation

27  began, or what documents or information were provided to the prosecution.  The evidence of cooperation is scant.  Second, there is nothing in the record to suggest that this conduct was inconsistent

28  with the duties of the insurance company.  The bare fact that potential victims of insurance fraud may cooperate with an investigator, either working for the insurance industry or with criminal authorities, does not constitute evidence of bad faith.

**United States District Court**

For the Northern District of California

1    *automatically* insulate an insurer from a bad faith claim based on a biased investigation."

2    *Chamberay*, 90 Cal. App.4th at 348 (emphasis in original).  The issues here are purely factual.

3            Defendant was in possession of reports and documents from at least six medical

4    professionals all of whom had evaluated Plaintiff or performed medical diagnostic procedures on

5    Plaintiff:  Dr. Lee, Dr. Thomas, Dr. Tlumacki, Dr. Smith, Dr. Provenzano, and Dr. Choo.  This is not

6    a case where Plaintiff submitted just one medical report – the initial medical evaluation from his

7    business partner, Dr. Lee.  Rather, numerous experts (many of whom have no affiliation with

8    Plaintiff or his businesses) have submitted corroboration of Plaintiff's disability and advised him not

9    to practice chiropractic medicine during the relevant time period.

10           Although Defendant's experts disagreed with these findings, Plaintiff has pointed to

11   deficiencies in the experts' reports that could provide a weak inference of bias.  For example, when

12   Defendant's expert Dr. Alba was presented with strong evidence of at least one disability – cubital

13   tunnel syndrome (a condition that was confirmed by surgery performed by Dr. Smith), he did not

14   alter his conclusion regarding his finding of no disability.  Rather, he concluded that Plaintiff should

15   be completely healed just 12 weeks after surgery.  Dr. Alba did not explain why he maintained his

16   belief that Plaintiff was not disabled *before* the surgery.  A reasonable jury could find that

17   Defendant's expert was biased when he ignored the fact that the initial diagnosis of possible cubital

18   tunnel syndrome was later confirmed with surgery by a neutral medical professional.  He also

19   provided no explanation as to why he did not conclude that Plaintiff was at least *partially* disabled.

20           In addition, Defendant concedes that Dr. Thomas diagnosed radiculopathy and cubital tunnel

21   syndrome.  *See* Kraft Decl., 5, 22-27, Exh. 11, Report of Dr. Kenneth Thomas, M.D.  Defendant

22   minimizes this finding by pointing out that the doctor's treatment plan consisted only of three weeks

23   of anti-inflammatory medication and rest.  Kraft Decl., Exhibit 11, at NM242.  A reasonable jury

24   could find, however, that Defendant's experts simply chose to ignore Dr. Thomas' clinical

25   examination and findings, in an effort to support denial of the claim.  Plaintiff correctly argues that

26   Defendant is required to "fully inquire into possible bases that might support the insured's claim"

27   before denying it.  Plaintiff's Opp. at 22 *citing Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 721

28

**United States District Court**
For the Northern District of California

1   (Cal. 2007).  An insurance carrier must focus on evidence available to it that supports the claim, not

2   just facts that support its denial.  *Id.* at 721.

3         Finally, Plaintiff argues that Defendant's reliance on the Peters & Associates audit to deny

4   coverage provides further proof of Defendant's biased investigation.  Plaintiff points out that the

5   very documents submitted to this Court by Sharon Kraft prove that Defendant had sufficient facts on

6   which to base its claim decision.  For example, in the first Peters & Associates report, dated June 6,

7   2003, the auditors explain that they "reviewed the detail of procedures performed by Dr. Origel from

8   1/01 through 7/02, by month (see Exhibit 3).  We note that the detail agrees with the summary

9   information previously submitted to your office.  We requested this same information from 8/02 to

10  the present numerous times but the insured has not yet provided it to us."  Kraft Decl., Exh. 17.  The

11  auditors therefore had detailed information about the procedures conducted by Plaintiff before the

12  disability period.  Moreover, the auditors explain in the initial report that they selected a sample of

13  patients, reviewed the patient chart and the fee slips, noting that the fee slips "were initialed by both

14  Dr. Origel and the patient."  *Id.* at NM 0519.  The report goes on to detail the bonus system at Med-

15  1, including setting forth the monthly collections for selected months in 2001, noting:  "Since each

16  provider's bonuses are based on collections, it is reasonable to assume that the reported collections

17  are accurate."  *Id.*  The auditors do not state that the absence of the additional documents prevented

18  them from conducting their audit.

19        The second auditors' report, dated August 19, 2003, is inconclusive.  The auditors were not

20  satisfied with the information provided by Plaintiff, noting that they had "planned to trace each

21  patient visit to appointment calendars, sign-in sheets, fee slips from the patient financial file, and the

22  patient medical chart.  However, the only detail provided was the fee slip from the financial file."

23  Kraft Decl., Exh. 18, NM 0553.

24        A reasonable jury could find that Defendant chose to ignore the informative aspects of the

25  reports, focusing only on the missing documents, as some evidence of bias.  Defendant provides no

26  case authority or expert opinion regarding the level of cooperation required.  Defendant's argument

27  is better suited for trial – when Plaintiff will bear the burden of proof.

28

United States District Court

For the Northern District of California

1    While Plaintiff may ultimately lose at trial depending on the credibility of his witnesses, it is

2    possible, viewing the evidence in a light most favorable to the Plaintiff, that he could prevail on his

3    claim that Defendant had sufficient information upon which to base its decision regarding coverage,

4    yet chose to ignore it relying instead upon missing documents from the audit.  Defendant's motion

5    for partial summary judgment on the bad faith claim is DENIED.

6    **F.  Intentional Infliction of Emotional Distress ("IIED")**

7    With respect to the IIED claim, Defendant argues that no genuine issue of material fact exists

8    and that the undisputed facts are insufficient to show extreme and outrageous conduct.  The

9    elements of a claim for intentional infliction of emotional distress are:  (1) outrageous conduct by

10   the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional

11   distress, (3) severe emotional injury, and (4) actual and proximate causation of the injury.  *Bogard v.*

12   *Employers Casualty Co.*, 164 Cal.App.3d 602, 616 (1985).  "Conduct is extreme and outrageous

13   when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which

14   is especially calculated to cause, and does cause, mental distress." *Molko v. Holy Spirit Assn.*, 46

15   Cal.3d 1092, 1122 (1988) (internal quotations and citations omitted).

16   In support of the claim for intentional infliction of emotional distress, there is evidence from

17   which a reasonable jury could conclude that Defendant:  (1) refused to pay benefits, (2) failed to

18   consider evidence demonstrating Plaintiff's disability, and (3) acted in bad faith.  As a result of

19   Defendant's conduct, Plaintiff claims to suffer anxiety, sleeplessness, fear for his future and that of

20   his family.  Origel Decl., ¶6.  This testimony, if believed by the jury, could support a finding of

21   extreme and outrageous conduct and severe emotional injury.

22   In *Little v. Stuyvesant Life Ins Co.*, 67 Cal.App.3d 451 (1977), plaintiff insured brought a

23   claim against her insurance company for intentional infliction of emotional distress arising out of

24   defendant's termination of her claim for total disability benefits.  After paying benefits for

25   approximately two years, the insurer canceled plaintiff's claim.  Defendant argued that no outrageous

26   conduct had occurred because it did nothing more than "decline to pay a disputed claim relying upon

27   the opinions of the reputable physicians to whom it sent plaintiff for examination." *Id.* at 461-62.

28   The case proceeded to trial.  The jury found that the insurer had engaged in outrageous conduct.

**United States District Court**
For the Northern District of California

1   The court upheld this finding, holding that the jury could reasonably conclude that defendant

2   purposely ignored the bulk of medical evidence disputing the conclusion of its physician, and that

3   defendant sought only to justify its predetermined course of discontinuing plaintiff's disability

4   benefit payments justly due under the policy. *Id.* at 462.

5        When considering a motion for summary judgment, the Court must view the evidence in a

6   light most favorable to the nonmoving party.  Accordingly, Defendant's motion for summary

7   judgment on the claim for intentional infliction of emotional distress is DENIED.

8        **G.  Fraud Claim**

9        Plaintiff's fraud claim fails as a matter of law.   Plaintiff essentially concedes his inability to

10  prevail on the fraud claim: "Fraud is more difficult because there is no allegation of fraud at the time

11  of contract."  Plaintiff's Opp. at 24.  The elements of fraud or deceit (*see* Cal. Civ.Code, §§ 1709,

12  1710) are: (1) a representation, usually of fact, (2) which is false, (3) knowledge of its falsity, (4)

13  intent to defraud, (5) justifiable reliance upon the misrepresentation, and (6) damage resulting from

14  that justifiable reliance."  *Stansfield v. Starkey,* 220 Cal.App.3d 59, 72 (1990).  Plaintiff cites no

15  authority and no specific facts in the record in support of a single element of his fraud claim.

16  Defendant's motion for partial summary judgment on the fraud claim is GRANTED.

17       **H.  Punitive Damages Claim**

18       Defendant argues that Plaintiff cannot meet the higher burden of establishing by "clear and

19  convincing evidence" that there is sufficient evidence for an award of punitive damages.   The Court

20  agrees.

21       Although the Court has concluded that the bad faith claim may proceed to trial, the standard

22  of proof on a claim for punitive damages at trial is higher than that to establish bad faith.  *Silberg v.*

23  *California Life Ins. Co.,* 11 Cal.3d 452 (1974) (finding of breach of good faith and fair dealing does

24  not necessarily establish requisite intent to injure plaintiff sufficient for punitive damages award).  In

25  order to justify an award of punitive damages, the defendant must be guilty of oppression, fraud or

26  malice by clear and convincing evidence.  California Civil Code §3294.  The jury must find that

27  defendant acted with the intent to vex, injure or annoy, or with a conscious disregard of plaintiff's

28  rights.  *Silberg*, 11 Cal.3d at 462 (citations omitted).

1    As explained above, Defendant's conduct in denying the claim creates a weak inference of

2  bad faith.  Based upon the evidence before the Court, no reasonable jury could find that Defendant

3  acted with the requisite malice to support a finding of punitive damages.  Defendant's motion for

4  partial summary judgment on the punitive damages claim is GRANTED.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment on the breach of

contract, bad faith and intentional infliction of emotional distress claims is DENIED. Defendant's

motion for partial summary judgment on the fraud and punitive damages claims is GRANTED.

IT IS SO ORDERED.

DATED:        November 14, 2008

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California